1

2

3

4

5

6           IN THE UNITED STATES DISTRICT COURT FOR THE

7                 EASTERN DISTRICT OF CALIFORNIA

8

9    KELLI THOMAS,                    )    CV F 06-0215 AWI SMS
                                      )
10                      Plaintiff,    )    MEMORANDUM OPINION AND
          v.                          )    ORDER REGARDING
11                                    )    DEFENDANTS' MOTIONS TO
     RODERICK HICKMAN, et al.,         )    DISMISS
12                                    )
                        Defendants.   )    (Docs. #41, #42, #43, #45, #47, & #48)
13   _____)

14

15        Plaintiff Kelli Thomas, an inmate at the Central California Women's Facility ("CCWF"),

16   has filed a civil rights action against prison medical staff, a private doctor, and private hospital.

17   The court has jurisdiction over Plaintiff's civil rights causes of action pursuant to 28 U.S.C. §

18   1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

19   Because the events underlying this action took place at CCWF and Madera Community Hospital,

20   venue in this court is appropriate.   Pending before the court are CDC Defendants' and Defendant

21   Madera Community Hospital ("Defendant Madera")'s motions to dismiss.

22                        PROCEDURAL BACKGROUND

23        On February 24, 2006, Plaintiff filed a complaint.  On May 5, 2006, Defendants filed

24   motions to dismiss the complaint.   On October 6, 2006, the court granted in part and denied in

25   part the motions.   Specifically, the court (1) denied without prejudice CDC Defendants' motion

26   to dismiss for Plaintiff's failure to exhaust administrative remedies; (2) dismissed with leave to

27   amend Plaintiff's first cause of action for a violation of the Eighth Amendment; (3) dismissed

28   with leave to amend Plaintiff's second cause of action for a violation of the Fourteenth

Amendment as to Defendant Madera only; (4) dismissed with leave to amend all state law causes of action as to CDC Defendants for Plaintiff's failure to allege compliance with the CTCA; (5) dismissed with leave to amend the third cause of action for a violation of Article 1, Section 17 of the California Constitution; (6) dismissed the fourth cause of action for a violation of Article 1, Section 7 of the California Constitution against Defendant Madera; (7) dismissed with leave to amend the sixth cause of action for failure to obtain consent; (8) dismissed with leave to amend the seventh cause of action for battery against Defendant Madera; (9) dismissed the eighth cause of action for gross negligence with prejudice and without leave to amend; (10) dismissed with leave to amend the ninth cause of action for intentional infliction of emotional distress; (11) dismissed the tenth cause of action for negligent infliction of emotion distress with prejudice, but with leave to include allegations concerning emotional distress under the negligence claim found in the fifth cause of action; (12) dismissed with leave to amend the eleventh and twelfth causes of action for fraud and negligent misrepresentation for failure to comply with Rule 9; and (13) struck the request for punitive damages from the complaint with leave to amend.

On November 9, 2006, Plaintiff filed a corrected first amended complaint ("complaint"). The first cause of action alleges a violation of the Eighth Amendment, pursuant to 42 U.S.C. § 1983, against Defendant Charles Ugwu-Oju ("Defendant Ugwu-Oju") and CDC Defendants. The second cause of action alleges a violation of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983, against Defendant Ugwu-Oju. The third cause of action alleges of violation of Article 1, Section 17 of the California Constitution against Defendant Ugwu-Oju and CDC Defendants. The fourth cause of action alleges a violation of Article 1, Section 7 of the California Constitution against Defendant Ugwu-Oju. The fifth cause of action alleges professional negligence against Defendant Ugwu-Oju, CDC Defendants, and Defendant Madera. The sixth cause of action alleges failure to obtain informed consent against Defendant Ugwu-Oju. The seventh cause of action alleges civil battery against Defendant Ugwu-Oju. The eighth cause of action alleges intentional infliction of emotional distress against all Defendants. The

ninth cause of action alleges intentional deceit/fraud against Defendant Ugwu-Oju, CDC Defendant Reeves, CDC Defendant Goodwin, and CDC Defendant Kruse.   The tenth cause of action alleges negligent misrepresentation by Defendant Ugwu-Oju, CDC Defendant Reeves, CDC Defendant Goodwin, CDC Defendant Kruse, and CDC Defendant Suryadavera.

On November 22, 2006, Defendant Madera filed a motion to dismiss the eighth cause of action against it for failure to state a claim.   Defendant Madera contends the complaint fails to allege sufficient facts to justify a claim for intentional infliction of emotional distress.

On November 28, 2006, CDC Defendants filed a motion to dismiss or alternatively for a more definite statement.   CDC Defendants contend that the complaint does not state sufficient facts to allege a violation of the eighth amendment.   CDC Defendants contend the court should decline to exercise supplemental jurisdiction over the state law claims.   CDC Defendants contend that the California Constitutional Claim against CDC Defendants should be dismissed because it is insufficiently pled.   CDC Defendants contend the fifth cause of action for professional negligence against CDC Defendant Suryadevara should be dismissed.   CDC Defendants contend the intentional infliction of emotional distress claim does not state a viable claim.   CDC Defendants contend that the claim for misrepresentation do not satisfy Rule 9(b) of the Federal Rules of Civil Procedure.

On December 18, 2006, Plaintiff filed an opposition to both motions.

On January 5, 2007, Defendant Madera and CDC Defendants filed reply briefs.

**ALLEGED FACTS**

Plaintiff is an inmate of CCWF.   The complaint alleges that as an inmate, she is dependent on the California Department of Corrections ("CDC") for her medical care, and the CDC has a duty to provide adequate medical care and protect her from harm.

The complaint alleges that in 1992, Plaintiff  suffered from blood clots and deep-vein thrombosis.

The complaint alleges that in 1999, Plaintiff had an abnormal pap smear and was sent to

1   Defendant Reeves for treatment in 2000, when Defendant Reeves became involved in and

2   directly responsible for Plaintiff's gynecological care. When Plaintiff first saw Defendant

3   Reeves, she was asked about her medical history and also asked her to complete a medical

4   history form. Plaintiff reported her history of blood clots and deep-vein thrombosis.  In 2000,

5   Defendant Reeves treated Plaintiff for her abnormal pap smear and then performed a second pap

6   smear which came back normal.

7       The complaint alleges that around the end of 2000, Plaintiff began to experience severe

8   abdominal pains and started menstruating on a biweekly cycle. Plaintiff went to see Defendant

9   Reeves who performed an examination.   On or around December 15, 2000, Defendant Reeves

10  ordered an ultrasound and a biopsy of Plaintiff's cervix. Soon after, in late 2000 or early 2001,

11  Defendant Reeves met with Plaintiff at CCWF again. Defendant Reeves reported that the

12  ultrasound revealed two cysts, one on each ovary, and that the biopsy also revealed severe

13  dysplasia and some potentially cancerous cells. Defendant Reeves explained to Plaintiff that he

14  was not worried about the cysts but was very concerned about the dysplasia and the possibility of

15  widespread cancer on her uterus. Defendant Reeves told Plaintiff that she would need to undergo

16  a surgical procedure known as a cystectomy to remove the cysts on her ovaries as well as a cone

17  biopsy of her cervix to check for cervical cancer.  Plaintiff, who was twenty-four years old at the

18  time, expressed to Defendant Reeves that she really wanted to have more children after her

19  release. Defendant Reeves assured Plaintiff that the planned cystectomy on each ovary was a

20  basic procedure and that it would not affect her reproductive capacity. On or around this time,

21  Defendant Reeves also told Plaintiff that he was going to refer her to Defendant Ugwu-Oju to

22  perform the planned cystectomies and cone biopsy at Defendant Madera.

23      The complaint alleges that in late 2000 or 2001, Defendant Reeves and the acting CMO

24  of CCWF decided to entrust Plaintiff to Madera Multi-Specialty Group and Defendants Madera

25  and Defendant Ugwu-Oju for medical care.

26      The complaint alleges that at no time before the surgery did Defendant Reeves ever

27

28                                            4

provide Plaintiff with non-surgical alternatives, discuss possible non-surgical options with her, or give her the opportunity to elect any possible alternatives. At no time before the surgery did Defendant Reeves ever inform Plaintiff of the possibility of sterilization, ovary removal, or any other medical complications regarding the surgical removal of cysts, despite his knowledge regarding her desire to have children. At no time before the surgery did Defendant Reeves ever warn Plaintiff that the planned cystectomies were particularly risky given her history of blood clots and deep-vein thrombosis because those conditions made treatment for post-surgical side effects difficult.

The complaint alleges that on or around February 9, 2001, before Plaintiff was sent to Defendant Madera for surgery, Defendant Ugwu-Oju met with Plaintiff at CCWF and told her that he would be performing both the planned cystectomies and cone biopsy. During this meeting, Defendant Ugwu-Oju asked Plaintiff if she had children and wanted to have more children one day.  Plaintiff told him that she was a mother and did want to have more children after she was released.  The complaint alleges that despite his intention to remove her ovaries, Defendant Ugwu-Oju did not disclose to Plaintiff that she would be sterilized as a result of the planned cystectomies. Instead, he assured her that the planned cystectomies were a simple and basic procedure.  The complaint alleges that Defendant Ugwu-Oju did not discuss non-surgical alternatives with Plaintiff or provide her with the opportunity to elect alternatives to surgery during this meeting or at any other time before surgery.

The complaint alleges that on April 5, 2001, CCWF sent Plaintiff to Defendant Madera for the planned cystectomies and a cone biopsy.

The complaint alleges that as a prisoner, Plaintiff was physically under the control of Defendants Ugwu-Oju and Madera and was dependent on them for her medical care.   The complaint alleges that Defendants Ugwu-Oju and Defendant Madera had a duty to provide Plaintiff with adequate medical care and to protect her from harm, including dangerous and unnecessary medical procedures.

The complaint alleges that on April 5, 2001, during preparations for surgery, Plaintiff was kept in a room at Madera with other CCWF inmates who were all being prepared for surgeries with Defendant Ugwu-Oju that day. Two female nurses or nursing assistants employed by Madera acting under the direction of Defendant Ugwu-Oju attended to Plaintiff.   The complaint alleges that during preparations for surgery, Plaintiff told one of the nurses employed by Madera that was attending to her that she had a history of blood clots and deep vein thrombosis.

The complaint alleges that nobody – not Defendant Ugwu-Oju nor any medical personnel at CCWF or Madera – ever informed Plaintiff of the fact that her ovaries would be damaged and/or removed during surgery or disclosed that it was a possible side effect of the planned cystectomies.   The complaint alleges that no one ever warned Plaintiff that the planned cystectomies and/or ovary removal was dangerous and difficult to treat due to Plaintiff's history of deep vein thrombosis and blood clots.   The complaint alleges that Plaintiff did not know that her ovaries were going to be removed and if she had known, she would not have consented to the planned cystectomies.

The complaint alleges that a nurse employed by Defendant Madera and acting under the direction of Defendant Ugwu-Oju that was attending to Plaintiff instructed her to sign a consent form.   The consent form signed by Plaintiff does not mention possible ovary removal.

The complaint alleges that Plaintiff was sent to a anesthesiologist employed by Defendant Madera. She told the anesthesiologist that she that she had a history of blood clots and deep vein thrombosis.

The compliant alleges that  Defendant Ugwu-Oju performed surgery on Plaintiff while she was unconscious.   Defendant Ugwu-Oju performed the cone biopsy and also killed and removed her ovaries.  The complaint alleges that he made no attempt to remove the cysts without harming Plaintiff's ovaries or without sterilizing her. In contradiction to his representations to Plaintiff that the planned cystectomies would not affect her reproductive capacity, Defendant Ugwu-Oju intentionally removed Plaintiff's ovaries, without regard to whether or not it was

6

necessary or beneficial. Immediately upon commencing the surgery, Defendant Ugwu-Oju and/or other attending medical staff acting under Defendant Ugwu-Oju's supervision clamped Plaintiff's infundibulopelvic ligaments before Defendant Ugwu-Oju even assessed the cysts on Plaintiff's ovaries and/or attempted to remove them without affecting Plaintiff's ovaries or reproductive capacity. This action cut off the blood flow to Plaintiff's ovaries and in essence "killed" them.   The complaint alleges that Defendant Ugwu-Oju could not have performed this procedure without knowing that it would permanently render Plaintiff incapable of procreation.

The complaint alleges that nurses and other attending medical staff employed by Defendant Madera actively participated in this unauthorized killing and removal of Plaintiff's ovaries.

The complaint alleges that after the surgery, on approximately April 6, 2001, Defendant Ugwu-Oju visited Plaintiff, who was in a recovery room. Defendant Ugwu-Oju told Plaintiff that in order to remove one ovarian cyst, he had to remove part of her fallopian tube and part of one ovary. In response, Plaintiff specifically asked Defendant Ugwu-Oju if she would still be able to have children. Defendant Ugwu-Oju assured Plaintiff that she could still have children and that no part of the procedure he performed would affect her ability to do so.

The complaint alleges that a pathology report dated April 6, 2001 regarding the specimens taken during the surgery reflects that Plaintiff's ovaries were both removed. This report and/or other records were sent to CDC and were in Plaintiff's CCWF medical file.   These documents reflect that Plaintiff's ovaries had been removed and that her reproductive capacity was destroyed.

The complaint alleges that Defendant Ugwu-Oju's discharge instructions included a prescription for Premarin, a hormone replacement therapy that is extremely dangerous for women with a history of blood clots and deep vein thrombosis, despite Plaintiff's history of blood clots and deep vein thrombosis.  The complaint alleges that this medication is usually not prescribed to women unless their reproductive capacity is destroyed.

The complaint alleges that following the surgery, Plaintiff was returned to the general population at CCWF.   The complaint alleges that Defendants Reeves and the acting CMO of CCWF and other agents of CCWF acting under the direction of the CMO were responsible for Plaintiff's care.

The complaint alleges that after the surgery, Plaintiff stopped menstruating altogether and lost over 100 pounds in the year following the surgery.   The complaint alleges that since the surgery, Plaintiff has experienced extreme fatigue, abdominal and lower back pain, hot flashes, and anxiety.   The complaint alleges that Plaintiff has repeatedly sought medical attention and asked for information regarding her condition, her reproductive capacity, the surgery, and its apparent effects.

The complaint alleges that immediately after the surgery and upon return to CCWF, Plaintiff felt fatigued and was experiencing pain.  The complaint alleges Premarin was dispensed to Plaintiff but she did not take it because she knew it was dangerous for women with a history of blood clots and deep vein thrombosis.

The complaint alleges that Plaintiff had to use the prison grievance system to have someone examine her stitches, check on her after surgery, and to see Defendant Reeves.

The complaint alleges that Plaintiff's medical records reflected that her ovaries were removed.  First, the surgical records and post-surgical records reflect that Plaintiff had been sterilized by having her ovaries removed. Second, the records reflect that Defendant Ugwu-Oju and Defendant Reeves both prescribed Premarin to Plaintiff, which is usually only prescribed to women who do not have reproductive capacity. Third, the records reflect that Plaintiff suffered from surgical menopause, a condition that reflects that her ovaries were removed.   Each of the CDC Defendants have had and continue to have access to Plaintiff's medical records.

The complaint alleges that on or around May 14, 2001, Plaintiff visited with Defendant Reeves for the first time since the surgery.   Plaintiff told Defendant Reeves that she was very concerned because she was in extreme pain, losing weight rapidly, and had not menstruated since

the surgery.   Plaintiff was concerned that she had cancer that was not caught on April 5, 2001

and/or that her reproductive system had been damaged during the procedures performed by

Defendant Ugwu-Oju on April 5, 2001. Defendant Reeves told Plaintiff that she was

experiencing surgical menopause and that her reproductive system had shut down but could kick

back in. Defendant Reeves suggested that Plaintiff take Premarin, but Plaintiff explained that she

did not want to take Premarin due to her history of blood clots and deep vein thrombosis.

Defendant Reeves told Plaintiff that he could prescribe a lower dosage, but Plaintiff reiterated

that she did not want to take Premarin.

The complaint alleges that Plaintiff saw Defendant Reeves every few weeks during the

spring and summer of 2001, including on or around May 30, 2001, June 20, 2001, July 22, 2001,

and September 4, 2001, and October 17, 2001.

The complaint alleges that during a visit with Defendant Reeves at CCWF on around the

summer of 2001, Plaintiff asked Defendant Reeves about her reproductive capacity and why she

was not menstruating. Defendant Reeves told Plaintiff that she was not menstruating because she

was suffering from surgical menopause and her hormonal levels, which he had been testing, were

too low. Plaintiff asked Defendant Reeves if she could still have children. Despite the fact that

Plaintiff's medical records reflect that Plaintiff's ovaries were removed and he had himself

prescribed Premarin and diagnosed Plaintiff as suffering from surgical menopause, Defendant

Reeves responded that while she could not at her current hormonal levels, she might be able to

have children in the future.

The complaint alleges that by about a year after the surgery, Plaintiff was extremely

concerned about her health, in particular her reproductive capacity and the possibility of cancer.

She was continuing to lose weight and suffer pain. She began to fear that either a hysterectomy

had been performed without her knowledge and/or that she was dying of cancer. On or around

that time, during a visit held with Defendant Reeves at CCWF, Plaintiff asked Defendant Reeves

what happened during surgery on April 5, 2001 and if she had had a hysterectomy. Despite the

9

fact that Plaintiff's medical records reflected that Plaintiff's ovaries were removed and he had himself prescribed Premarin and diagnosed Plaintiff as suffering from surgical menopause, Defendant Reeves said that the surgical records showed that she had just had cystectomies and a cone biopsy and represented that her reproductive system was intact.

The complaint alleges that shortly thereafter, Defendant Reeves met with Plaintiff at CCWF. Despite the fact that Plaintiff's medical records reflect that Plaintiff's ovaries were removed and he had himself prescribed Premarin and diagnosed Plaintiff as suffering from surgical menopause, Defendant Reeves told Plaintiff that both of her ovaries were normal. Defendant Reeves reported that an ultrasound reflected this.   Plaintiff asked why she was not menstruating, losing so much weight, and in pain. In response to Plaintiff's questions, Defendant Reeves made light of her medical concerns and condition, stating that there was nothing to worry about and that the reproductive organs of women are all different. He told her that her ovaries were just "drooping" and that "maybe they would wake up."

The complaint alleges that as a result of her confusion regarding her medical treatment and the status of her reproductive capacity, Plaintiff became severely depressed and started to have panic attacks. Her anxiety became so great that she would not leave her room to attend required programming at CCWF or to eat in the mess hall. Plaintiff became suicidal and had to receive emergency psychiatric treatment.

In 2002 and 2003, as Plaintiff continued to experience painful and abnormal physical symptoms and suffer severe emotional distress, she told Defendant Goodwin about her surgery and symptoms and her belief that something was not right with her health. In response to Plaintiff's concerns about her medical condition, Defendant Goodwin acted abusively and dismissively. She told Plaintiff that there was nothing physically wrong with her and that she was just imagining her problems. She also told Plaintiff that Plaintiff should not worry about her rapid weight loss, particularly because women usually want to become thinner. Defendant Goodwin referred Plaintiff for psychiatric care, but Plaintiff was denied psychological or

psychiatric care other than medication.

The complaint alleges that despite the fact that Plaintiff's medical records reflect that her ovaries were removed, Defendant Goodwin met with Plaintiff at CCWF on or around May of 2003 and told Plaintiff that, according to an ultrasound that she had ordered, Plaintiff's ovaries appeared normal and that her symptoms and health concerns were just in her head.

The complaint alleges that Plaintiff was still in pain and had not resumed menstruating following the surgery. She expressed her continuing concerns to CCWF medical staff, including Defendant Kruse.

The complaint alleges that despite the fact that Plaintiff's medical records reflect that her ovaries were removed, Defendant Kruse met with Plaintiff sometime on around January of 2005 and told Plaintiff that, according to an ultrasound that she had ordered, Plaintiff's right ovary was normal, but there was no "clear image" of the left ovary.

The complaint alleges that on or around June of 2005, Plaintiff specifically requested that Defendant Reeves provide her with a non-hormonal treatment for post-surgical menopause. Neither Reeves nor any other medical personnel at CCWF have done so.

The complaint alleges that on or around July of 2005, Defendant Suryadevara called Plaintiff into a meeting with Defendant Reeves and members of CCWF's "Women's Advisory Council" to discuss Plaintiff's medical condition, her complaints, and her attorney's notices of intent to sue. Defendant Suryadevara stated to Plaintiff that nobody would treat her if she threatened litigation. Defendant Reeves told Plaintiff that, even if her ovaries were removed, there was nothing they could do about it and the only way to know for certain whether or not she had her ovaries would be to cut her open again. Around this time, Defendant Kruse also complained to Plaintiff about the notice of intent to sue that she received. Despite his knowledge regarding the situation, Defendant Suryadevara has not disclosed to Plaintiff whether she has her ovaries and has not provided her with appropriate and adequate medical care.

The complaint alleges that since this meeting, Plaintiff has not been treated by Defendant

Reeves or any other gynecologist.

The complaint alleges that around September or October of 2005, CCWF abruptly called Plaintiff out of work and sent Plaintiff to Defendant Madera without any explanation.  Plaintiff was not informed in advance that she would be sent to the hospital and was confused when she was abruptly called out of work at the last minute without explanation. When Plaintiff arrived at Defendant Madera, she was instructed to drink a lot of water but the medical staff there did not tell her what procedure she was going to undergo.   Plaintiff refused the unknown treatment.

The complaint alleges that numerous tests have been performed on Plaintiff since 2003. Despite Defendant Suryadavera's knowledge regarding Plaintiff's concerns, the problems with her treatment, the numerous tests that were being performed on her, the confusion regarding the status of her ovaries and reproductive capacity, and the fact that CCWF medical personnel had not disclosed the fact that her ovaries were removed, he has failed to act and continues to fail to provide Plaintiff with adequate medical care.

Plaintiff continues to be confused and upset by what Defendants Reeves, Goodwin, and Kruse have told her. She has been left completely uncertain about the status of her health and her reproductive capacity. To this day, no doctor at CCWF has told her whether or not she still has her ovaries and can reproduce.

The complaint alleges that Defendant Reeves has repeatedly refused to provide non-hormonal treatment for the post-surgical menopause that Plaintiff is experiencing.

The complaint alleges that as a result of the removal of her ovaries, Plaintiff has lost her reproductive capacity.  Plaintiff is due to be released on February 21, 2009, when she will still be in her thirties, and had desired to have more children in the future. The removal of her ovaries has permanently altered her hormone levels and caused the onset of premature menopause, inflicted severe emotional distress, fear, and anxiety upon Plaintiff, and caused other serious medical complications. The complaint alleges that the CDC Defendants have not provided appropriate care for these symptoms and have only offered Plaintiff medication that would

12

1  endanger her health. Further, the failure of the CDC Defendants to give Plaintiff an accurate

2  answer regarding her medical condition and her reproductive capacity has caused Plaintiff to

3  suffer severe emotional distress, fear, and anxiety, and endure other serious medical

4  complications.

5      The complaint alleges that the CDC Defendants continue to misrepresent and/or refuse to

6  disclose information regarding Plaintiff's ovaries. CDC Defendants have also still not provided

7  Plaintiff with appropriate treatment. Instead,  CDC Defendants and Defendant Madera have

8  harassed Plaintiff for seeking medical help, complaining about her medical treatment, and

9  pursuing litigation by complaining to her regarding her then pending lawsuit

10                                    **LEGAL STANDARD**

11      A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil

12  Procedure if it appears beyond doubt that the plaintiff can prove no set of facts in support of the

13  claim that would entitle him to relief.  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) (citing

14  Conley v. Gibson, 355 U.S. 41, 45-46 (1957)); Balistreri v. Pacifica Police Department, 901 F.2d

15  696, 699 (9th Cir. 1990).  A Rule 12(b)(6) dismissal can be based on the failure to allege a

16  cognizable legal theory or the failure to allege sufficient facts under a cognizable legal theory.

17  Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir.1984).  In considering a

18  motion to dismiss, the court must accept as true the allegations of the complaint in question,

19  Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740 (1976), construe the pleading in

20  the light most favorable to the party opposing the motion, and resolve all doubts in the pleader's

21  favor.  Jenkins v. McKeithen, 395 U.S. 411, 421, reh'g denied, 396 U.S. 869 (1969).

22      A Rule 12(b)(6) motion to dismiss for failure to state a claim is disfavored, see Hall v.

23  City of Santa Barbara, 833 F.2d 1270, 1274 (9th Cir.1986), and may be granted only in

24  extraordinary circumstances, see Gilligan v. Jamco Develop. Corp., 108 F.3d 246, 249 (9th

25  Cir.1997). Essentially, a motion to dismiss for failure to state a claim tests plaintiff's compliance

26  with the liberal requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure.  See 5A

27

28                                          13

1  Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1356, at 294-96.  The

2  burden imposed by Rule 8(a)(2) is a minimal one. Rule 8(a)(2) requires parties seeking relief in

3  federal court by way of complaint, counterclaim, cross-claim, or third party complaint, to include

4  "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule

5  8(a)(2). It is the burden of the party bringing a motion to dismiss for failure to state a claim to

6  demonstrate that the requirements of Rule 8(a)(2) have not been met.   <u>See</u> <u>Kehr Packages, Inc. v.</u>

7  <u>Fidelcor, Inc.</u>, 926 F.2d 1406, 1409 (3d Cir.1991) ("[U]nder Rule 12(b)(6) the defendant has the

8  burden of showing no claim has been stated.").   As the Supreme Court has noted, when

9  evaluating a complaint for failure to state a claim, the question is not whether the facts stated in

10  the complaint, if proven, would entitle the plaintiff to any relief. Instead, the question is whether

11  there is any set of "facts that could be proved consistent with the allegations of the complaint"

12  that would entitle plaintiff to some relief. <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 514

13  (2002); <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984); <u>Diaz v. Gates</u>, 380 F.3d 480, 482

14  (9th Cir. 2004).

**DISCUSSION**

16       There are two motions to dismiss pending before the court.   CDC Defendants have filed

17  one motion to dismiss addressing all of the complaint's causes of action.   Defendant Madera has

18  filed a second motion to dismiss concerning only Plaintiff's cause of action for intentional

19  infliction of emotional distress against Madera.  Because each motion addresses whether there

20  are sufficient facts to state a claim against the moving Defendants, the Defendants' motions are

21  addressed separately below.

**I.  CDC DEFENDANTS' MOTION**

**A.  First Cause of Action –  Violation of Eighth Amendment**

24       The first cause of action is brought under 42 U.S.C. § 1983 and alleges a violation of the

25  Eighth Amendment.   CDC Defendants contend that the complaint fails to state a claim for a

26  violation of the Eighth Amendment against them because it fails to allege that they violated

27

28                                          14

1  Plaintiffs' Eighth Amendment rights.

2        To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison

3  conditions must involve "the wanton and unnecessary infliction of pain." Rhodes v. Chapman,

4  452 U.S. 337, 347 (1981).   A prisoner's claim of inadequate medical care constitutes cruel and

5  unusual punishment if the mistreatment rises to the level of "deliberate indifference to serious

6  medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976).   A prisoner's claim of inadequate

7  medical care does not rise to the level of an Eighth Amendment violation unless (1) "the prison

8  official deprived the prisoner of the 'minimal civilized measure of life's necessities,'" and (2)

9  "the prison official 'acted with deliberate indifference in doing so.'" Toguchi v. Chung, 391 F.3d

10  1051, 1057 (9th Cir. 2004) (quoting Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002)

11  (citation omitted)).

12        A prison official does not act in a deliberately indifferent manner unless the official

13  "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511

14  U.S. 825, 834 (1994).   The "deliberate indifference" standard involves an objective and a

15  subjective prong.   First, the alleged deprivation must be, in objective terms, "sufficiently

16  serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294,

17  298 (1991)).   Second, the prison official must act with a "sufficiently culpable state of mind,"

18  which entails more than mere negligence, but less than conduct undertaken for the very purpose

19  of causing harm. Farmer, 511 U.S. at 837.   A prison official does not act in a deliberately

20  indifferent manner unless the official "knows of and disregards an excessive risk to inmate health

21  or safety." Id.

22        Deliberate indifference may be manifested "when prison officials deny, delay or

23  intentionally interfere with medical treatment," or in the manner "in which prison physicians

24  provide medical care." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on*

25  *other grounds*, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

26  Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to

27

28                                        15

further harm in order for the prisoner to make a claim of deliberate  indifference to serious medical needs.  McGuckin, 974 F.2d at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

In applying the deliberate indifference standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06).  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle v. Gamble, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995); McGuckin, 974 F.2d at 1050.  Even gross negligence is insufficient to establish deliberate indifference to serious medical needs.  See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).  A prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference.  Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

In the complaint and opposition, Plaintiff clarifies that her claims for deliberate indifference against the CDC Defendants is based on their deliberately indifference to Plaintiff's serious medical needs after surgery, including not telling Plaintiff what really happened during the surgery, not advising Plaintiff that her ovaries had been removed, improperly treating Plaintiff after surgery, and not providing Plaintiff with non-hormonal treatments for menopause. The complaint alleges that each of the CDC Defendants violated Plaintiff's right to be free from cruel and unusual punishment by failing to pursue a medically acceptable course of treatment after the surgery in conscious disregard of the excessive risk of failing to appropriately treat surgical menopause in a woman of Plaintiff's' age and with Plaintiff's medical history, despite the fact that her medical records reflected that her ovaries were removed and despite the fact that

16

1  they knew that she was suffering from the symptoms of post-surgical menopause.   The

2  complaint alleges that the CDC Defendants' actions and omissions demonstrate deliberate

3  indifference to Plaintiff's serious medical needs and to her Eighth Amendment right to be free

4  from cruel and unusual punishment.

5       In granting CDC Defendants' prior motion to dismiss, the court found that the complaint

6  failed to allege how CDC Defendants knew of Plaintiff's true medical condition.   The current

7  complaint still does not allege that CDC Defendants "knew" Plaintiff's ovaries had been

8  removed but failed to tell her and did not treat her menopause.   However, unlike the prior

9  complaint, the current complaint provides facts from which a trier of fact could conclude CDC

10  Defendants knew about the removal of Plaintiff's ovaries.   The complaint alleges that

11  Defendant Ugwu-Oju's medical records reflected that Plaintiff's ovaries were removed during

12  the surgery.   The complaint alleges that these records were put in Plaintiff's CDC medical file.

13  When Plaintiff was treated by CDC Defendants, she was complaining about symptoms

14  concerning her reproductive system.   The complaint alleges that Plaintiff also raised the issue of

15  the surgery with CDC Defendants, asking what occurred.   A trier of fact could make the

16  inference based on these alleged facts that CDC Defendants did review Defendant Ugwu-Oju's

17  records when they treated Plaintiff.   The complaint also alleges that Premarin is prescribed for

18  menopause. From this fact, an inference could also be drawn that CDC Defendants knew

19  Plaintiff was in menopause because her ovaries were removed.   Finally, CDC Defendants'

20  deliberate indifference can also potentially be shown based on CDC Defendants refusal to treat

21  Plaintiff's pain, fatigue, anxiety, and weight loss.   Based on the complaint's current allegations,

22  the court finds that there is a set of facts that could be proved consistent with the allegations of

23  the complaint that would show CDC Defendants' knew of Plaintiff's true medical condition and

24  failed to inform her about it and treat her. See Swierkiewicz, 534 U.S. at 514; Diaz, 380 F.3d at

25  482.

26       The court recognizes that if the trier of fact only finds that CDC Defendants should have

27

28                                          17

1  read Defendant Ugwu-Oju's records and realized both ovaries had been removed based on

2  Plaintiff's symptoms, CDC Defendants can escape liability under 42 U.S.C. § 1983.   A prison

3  official must not only be aware of the basic facts from which the inference could be drawn that a

4  substantial risk of serious harm exists, but that person must also draw the inference.  Toguchi,

5  391 F.3d at 1057 (quoting Farmer, 511 U.S. at 837).   Medical malpractice simply does not

6  become a constitutional violation merely because the victim is a prisoner.  Estelle, 429 U.S. at

7  106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995).  However, the

8  standard on this motion to dismiss is whether taking the complaint's allegations as true and

9  resolving all doubts in Plaintiff's favor, Plaintiff has pled facts showing deliberate indifference.

10  It does not appear beyond doubt that Plaintiff can prove no set of facts in support of the claim

11  that would entitle her to relief.  See Hishon, 467 U.S. at 73.  Thus, the complaint states a claim

12  under 42 U.S.C. § 1983.

13       In their motion, CDC Defendants also contend that Plaintiff has failed to state a claim

14  against Defendant Suryadevara based on his conduct as a supervisor.   To show a supervisor's

15  liability, Plaintiff must show (1) Defendant Suryadevara's personal involvement in the

16  constitutional deprivation, or (2) a sufficient causal connection between Defendant Suryadevara's

17  wrongful conduct and the constitutional violation.   See Jeffers v. Gomez, 267 F.3d 895, 915 (9th

18  Cir.2001).   Supervisors can be held liable if they play an affirmative part in the alleged

19  deprivation of constitutional rights by setting in motion a series of acts by others which the

20  supervisor knew or reasonably should have known would cause others to inflict the constitutional

21  injury.  Graves v. City of Coeur D'Alene, 339 F.3d 828, 848 (9th Cir.2003) (citations omitted)

22  (quoting Rise v. Oregon, 59 F.3d 1556, 1563 (9th Cir.1995); Larez v. City of LA, 946 F.2d 630,

23  646 (9th Cir.1991)).   The court finds the complaint's allegations sufficiently allege affirmative

24  conduct by Defendant Suryadevara from which a trier of fact could find Defendant Suryadevara

25  violated Plaintiff's Eighth Amendment rights.   The complaint alleges Defendant Suryadevara

26  was aware of Plaintiff's symptoms after surgery.   The complaint alleges Defendant Suryadevara

27

28                                                      18

was aware Plaintiff had concerns about what occurred during the surgery.   The complaint alleges Defendant Suryadevara met with Plaintiff to discuss her medical condition and this lawsuit. The complaint alleges Defendant Suryadevara informed Plaintiff no further treatment would be provided if Plaintiff proceeded with a lawsuit, and the complaint alleges Plaintiff has received no further medical care from any CDC medical personnel.   Not only are these allegations sufficient to show that Defendant Suryadevara knew Plaintiff's ovaries had been removed and disregarded this knowledge, but they also are sufficient to show Defendant Suryadevara knew of Plaintiff's current and continuing need for medical treatment and disregarded her serious medical needs by refusing further treatment.

Because the current complaint contains additional allegations showing how a trier of fact could make the inference that CDC Defendants knew of Plaintiff's medical condition and disregarded it, CDC Defendants motion to dismiss the first cause of action must be denied.

**B.   All State Law Causes of Action – Supplemental Jurisdiction**

CDC Defendants request the court decline to exercise supplemental jurisdiction over the state law claims in the event the court dismisses the federal claims.  "[P]endant jurisdiction is a doctrine of discretion not of plaintiff's right.  Its justification lies in considerations of judicial economy, convenience and fairness to the litigants; if these are not present, a federal court should hesitate to exercise jurisdiction over state claims."  United Mine Workers v. Gibbs, 383 U.S. 715, 726  (1966).   The court may decline to exercise supplemental jurisdiction over state claims when the federal claims are dismissed before trial.  See 28 U.S.C. § 1367(c)(3); Gibbs, 383 U.S. at 726.  Because the court declines to dismiss the federal cause of action against the CDC Defendants and other federal causes of action remain against another Defendant, the court will continue to exercise supplemental jurisdiction over the state law claims at this time.

**C.  Fifth Cause of Action – Negligence Claim Against Defendant Suryadevara**

The fifth cause of action alleges professional negligence against Defendant Ugwu-Oju, the CDC Defendants, and Defendant Madera.  CDC Defendants request the court dismiss the

professional negligence claim against Defendant Suryadevara for failure to allege negligence by

Defendant Suryadevara.

The elements a plaintiff must prove for a negligence action based on medical malpractice

are: "(1) the duty of the professional to use such skill, prudence, and diligence as other members

of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate

causal connection between the negligent conduct and the resulting injury; and (4) actual loss or

damage resulting from the professional's negligence." Johnson v. Superior Court, 143

Cal.App.4th 297, 305 (2006);  Hanson v. Grode, 76 Cal.App.4th 601, 606 (1999).

Concerning negligence, California law provides:

> A physician, performing professional services for a patient, owes the patient the
> following duties of care:
> 1. The duty to have that degree of learning and skill ordinarily possessed by
> reputable physicians, practicing in the same or a similar locality and under similar
> circumstances;
> 2. The duty to use the care and skill ordinarily exercised in like cases by reputable
> members of the profession practicing in the same or a similar locality under
> similar circumstances; and
> 3. The duty to use reasonable diligence and [his] [her] best judgment in the
> exercise of skill and the application of learning.
> A failure to perform any one of these duties is negligence.

CA  B.A.J.I.  6.00.1; see also Keen v. Prisinzano, 23 Cal.App.3d 275, 279 (1972).

CDC Defendants contend the negligence claim against Defendant Suryadevara should be

dismissed because Defendant Suryadevara is being sued in his administrative capacity and he did

not personally render any medical care to Plaintiff.  Plaintiff contends her negligence claim

against Defendant Suryadevara is *not* predicated on Defendant Suryadevara's supervisory role

over the other CDC Defendants;   Plaintiff claims it is based on the duty Defendant Suryadevara

*himself* owed Plaintiff.

The court finds the complaint states a claim against Defendant Suryadevara based on a

theory that Defendant Suryadevara owed Plaintiff a duty.   As discussed above, the complaint

alleges that Defendant Suryadevara became directly involved in Plaintiff's health care.

Defendant Suryadevara personally met with Plaintiff to discuss the surgery, Plaintiff's medical

20

treatment since the surgery, and a potential lawsuit arising from the surgery.   Based on the allegations that Defendant Suryadevara had access to Plaintiff's medical records and Plaintiff's medical records reflected the fact both of Plaintiff's ovaries had been removed, and inference can be made that Defendant Suryadevara knew Plaintiff's ovaries were gone.   The complaint alleges that despite this knowledge, Defendant Suryadevara did not inform Plaintiff about the surgery and informed Plaintiff she would no longer receive medical treatment if she sued.   The complaint alleges that Plaintiff has not been provided with medical care.   As such, an inference can be made that Defendant Suryadevara's actions resulted in Plaintiff receiving no medical treatment.   Based on the allegation that Defendant Suryadevara had personal knowledge of Plaintiff's case, Defendant Suryadevara met with Plaintiff to discuss the surgery and medical treatment, and Defendant Suryadevara was responsible for Plaintiff receiving no additional medical treatment, the court finds the complaint alleges sufficient facts to show that Defendant Suryadevara owed Plaintiff a duty of care because he personally became involved in Plaintiff's medical care and treatment.   Thus, the fifth cause of action for negligence against Defendant Suryadevara will not be dismissed.

**D. Eighth Cause of Action – Intentional Infliction of Emotional Distress**

CDC Defendants contend that the eighth cause of action, alleging intentional infliction of emotional distress, should be dismissed because the complaint does not allege extreme or outrageous conduct or that this conduct was especially calculated to cause Plaintiff mental distress.   Plaintiff contends the complaint is sufficient because it alleges that CDC Defendants failed to adequately treat Plaintiff's medical condition and falsely told her that her ovaries had not been removed.

The elements of a claim of intentional infliction of emotional distress are (1) extreme and outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress.   Austin v. Terhune, 367 F.3d 1167, 1172 (9th Cir.

2004); <u>Christensen v. Superior Court</u>, 54 Cal.3d 868, 903-04 (1991); <u>Cole v. Fair Oaks Fire</u>

<u>Protection Dist.</u>, 43 Cal.3d 148, 233 n.7 (1987).   The "[c]onduct to be outrageous must be so

extreme as to exceed all bounds of that usually tolerated in a civilized community." <u>Davidson v.</u>

<u>City of Westminster</u>, 32 Cal.3d 197, 209 (1982)  "Conduct is extreme and outrageous when it is

of a nature which is especially calculated to cause, and does cause, mental distress."   <u>Wilkerson</u>

<u>v. Butler</u>, 229 F.R.D. 166, 171 (E.D. Cal. 2005).   Liability does not extend to mere insults,

indignities, threats, annoyances, petty oppressions, or other trivialities.   <u>Fisher v. San Pedro</u>

<u>Peninsula Hospital</u>, 214 Cal.App.3d 590, 617 (1989).   While the issue of outrageousness is

normally an issue of fact to be determined by the trier of fact, the court may determine in the first

instance whether the defendant's conduct may reasonably be regarded as so extreme and

outrageous as to permit recovery.   <u>Trerice v. Blue Cross of California</u>, 209 Cal.App.3d 878, 883

(1989).

   Accepting as true all allegations in the complaint and construing the complaint's

allegations to make all inferences in Plaintiff's favor, the court finds the complaint states a claim

against CDC Defendants for intentional infliction of emotional distress.   As discussed above, the

complaint's allegations are sufficient for a trier of fact to conclude CDC Defendants knew

Plaintiff's ovaries had been removed.   The complaint alleges Plaintiff's CDC medical records

contained Defendant Ugwu-Oju's surgery records, which showed Defendant Ugwu-Oju had

removed both ovaries.   The complaint alleges Plaintiff met numerous times with CDC

Defendants about continued problems with her reproductive system and even specifically

discussed whether her current problems were related to the surgery.   The complaint alleges

CDC's Defendants' treatment of Plaintiff, such as prescribing Premarin, was consistent with the

removal of ovaries and not the surgery CDC Defendants' claimed Plaintiff had.   Finally, the

allegations concerning CDC Defendants' refusal to provide Plaintiff with medical treatment after

it appeared she might sue also could indicate CDC Defendant's knew they had been misleading

Plaintiff.   Based on these facts, an inference can be made that CDC Defendants knew Plaintiff's

1  ovaries were gone, lied to her about the removal of her ovaries, and did not properly treat her

2  menopause.

3      Because the court finds the complaint's allegations sufficiently allege CDC's Defendants

4  knew Plaintiff's ovaries were removed, lied to Plaintiff about what happened during surgery, did

5  not properly treat her, and refused treatment when it appeared Plaintiff might sue, the court finds

6  the complaint sufficiently alleges intentional infliction of emotional distress.   Such lies to a

7  patient about what occurred during a surgery are sufficient to allege extreme and outrageous

8  conduct by CDC Defendants.   Lying to a patient about a serious medical condition and not

9  treating that condition is so extreme as to exceed all bounds of that are usually tolerated in a

10  civilized community.   The complaint alleges that being told nothing was wrong with her and not

11  being treated caused Plaintiff to suffer from anxiety and depression and she was treated for

12  mental health needs.   These allegations are sufficient to alleged severe emotional suffering was

13  the actual and proximate cause of CDC Defendants' alleged lies.   Thus, the complaint states

14  sufficiently extreme conduct.

15      CDC Defendants contend that the complaint fails to sufficiently allege that CDC

16  Defendants intended to cause Plaintiff emotional distress.   The tort of intentional infliction of

17  emotional distress requires intentional or reckless conduct.   Davidson v. City of Westminster,  32

18  Cal.3d 197, 210 (1982); Ess v. Eskaton Properties, Inc., 97 Cal.App.4th 120, 130 (2002).

19  However, contrary to Defendants' contentions, California law does not require a plaintiff to

20  allege that the conduct was directed at plaintiff "when the defendant is aware of, but acts with

21  reckless disregard of the plaintiff and the probability that his [or her] conduct will cause severe

22  emotional distress to that plaintiff." Sabow v. United States,  93 F.3d 1445, 1455 n.11 (9th Cir.

23  1996); Christensen v. Superior Court, 54 Cal.3d 868, 903 (1991).   Showing reckless conduct

24  does not require the plaintiff to demonstrate that the defendants acted with a "malicious or evil

25  purpose." KOVR-TV, Inc. v. Superior Court,  31 Cal.App.4th 1023, 1031 (1995).   "It is enough

26  that defendant devoted little or no thought to the probable consequences of his conduct." Id. at

27

28                                          23

1   1031-32.

2        For example, in <u>Davidson v. City of Westminster</u>, police officers failed to intervene and

3   protect the  plaintiff when they saw a suspected assailant enter a laundromat. The California

4   Supreme Court held that, absent an intent on the part of the police officers to injure the plaintiff,

5   as opposed to catching the suspect, their conduct could not give rise to a claim for intentional

6   infliction of emotional distress.  <u>Davidson</u>,  32 Cal.3d at 210.   In <u>Marsh v. San Diego County</u>, a

7   plaintiff alleged the defendants intentionally accused him of abusing a child to hide their own

8   wrongdoing, causing the plaintiff to be unlawfully seized and deprived of his liberty for 21 years.

9   <u>Marsh v. San Diego County</u>, 432 F.Supp.2d 1035, 1055 (S.D.Cal.,2006).  The Southern District

10  of California found the making of such false allegations sufficient to allege intentional infliction

11  of emotional distress.  <u>Id</u>.   Similarly, in <u>Cervantez v. J.C. Penney Co.</u>, 24 Cal.3d 579 (1979), an

12  intentional infliction of emotional distress claim was allowed to proceed under a "reckless

13  disregard" theory when the defendants arrested the plaintiff with knowledge that he had not

14  committed an offense or disregarding all evidence of whether he had.

15       The court finds a reasonable trier of fact could conclude that CDC Defendants at least

16  acted recklessly with regard to the probability that lying to Plaintiff about her medical condition

17  would cause her severe emotional distress.[1]   This court recognizes that another Judge in this

18  court found that a mis-diagnosis could not serve as the basis for an intentional infliction of

19  emotional distress claim.   In <u>Wilkerson v. Butler</u>, 229 F.R.D. 166 (E.D.Cal. 2005) the court

20  stated:

21          The intentional infliction of emotional distress (fifth) cause of action merely
            alleges that Dr. Butler knew or should have known that his mis-diagnosis would
22          cause Ms. Wilkerson distress. The cause of action lacks allegations of essential
            elements of an intentional infliction of emotional distress cause of action. The
23

24  _____

25      [1]  It appears CDC Defendants' argument in part is based on the position that if CDC
    Defendants lied to Plaintiff to cover up potential malpractice during the surgery instead of to
26  cause Plaintiff emotional distress, Plaintiff cannot recover on an intentional infliction of
    emotional distress theory.   However, CDC Defendants have cited no case in which an intentional
27  lie, of such serious magnitude as what Plaintiff alleges occurred to her, was found insufficient to
    show intentional infliction of emotional distress on a "reckless disregard" theory.

28                                            24

1  cause of action adds nothing new and merely asserts claims incorporated into the
2  medical malpractice (first) cause of action to warrant striking it.

3  Id. at 172.  However, this case concerns more than a mere mis-diagnosis.  Making all reasonable

4  inferences from the complaint, the complaint alleges that CDC Defendants' knew Plaintiff's

5  ovaries had been removed and knowingly lied to her about what happened during the surgery and

6  Plaintiff's current medical condition.  The removal of Plaintiff's ovaries had serious

7  ramifications to Plaintiff's health and her future ability to procreate.  Facts consistent with those

8  found in the complaint could be proven to show that CDC Defendants' alleged lying to Plaintiff

9  about what had happened, misleading Plaintiff about the basis of her current symptoms, and

10  treating Plaintiff for a reproductive problem she could not possibly have had was done with

11  reckless disregard to the probability that CDC Defendants' conduct would cause severe

12  emotional distress.  Thus, the court finds that the complaint's allegations are sufficient to state a

13  claim for intentional infliction of emotional distress against CDC Defendants.

14  **E. Ninth and Tenth Causes of Action – Misrepresentation**

15  CDC Defendants contend that the ninth and tenth causes of action for intentional and

16  negligent misrepresentation are subject to dismissal because they do not meet with the

17  requirement of Rule 9(b) of the Federal Rules of Civil Procedure.

18  Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting

19  fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition

20  of mind of a person may be averred generally." Fed. R. Civ. Proc. 9(b).  "A pleading 'is sufficient

21  under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can

22  prepare an adequate answer from the allegations.'" Neubronner v. Milken, 6 F. 3d 666, 671 (9th

23  Cir. 1993) (quoting Gottreich v. San Francisco Investment Corp., 552 F. 2d 866, 866 (9th Cir.

24  1977).)  A complaint alleging fraud meets the standard if it alleges the time, place, and content of

25  the fraudulent statements, including reasons why the statements are false. Decker v. GlenFed,

26  Inc., 42 F.3d 1541, 1547-48 (9th Cir. 1994) (en banc).  However, where fraud allegedly occurred

27

28                                             25

over a period of time, Rule 9(b)'s requirement that the circumstances of fraud to be stated with particularity have been less stringently applied.   United States v. Hempfling, 431 F. Supp. 2d 1069, 1075 (E.D. Cal. 2006) (citing Fujisawa Pharm. Co., Ltd. v. Kapoor, 814 F. Supp. 720, 726 (N.D. Ill. 1993) and United States ex rel. Semtner v. Med. Consultants, Inc., 170 F.R.D. 490, 497 (W.D. Okla. 1997)).

"The elements of fraud, which gives rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."   Small v. Fritz Companies, Inc., 30 Cal.4th 167, 173 (2003); Lazar v. Superior Court, 12 Cal.4th 631, 638 (1996); Anderson v. Deloitte & Touche, LLP, 56 Cal.App.4th 1468, 1474 (1997).   An intentional misrepresentation is "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true."   Masters v. San Bernardino County Employees Ret. Assn., 32 Cal.App.4th 30, 41-42 (1995).   Negligent misrepresentation requires a plaintiff to prove "misrepresentation of a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce another's reliance on the fact misrepresented; ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and resulting damage."   Home Budget Loans, Inc. v. Jacoby & Meyers Law Offices, 207 Cal.App.3d 1277, 1285 (1989).   The tort of negligent misrepresentation does not require scienter or intent to defraud.   Small, 30 Cal. 4th at 173; Gagne v. Bertran, 43 Cal.2d 481, 174 (1954).   Negligent misrepresentation  encompasses "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true," see Cal. Civ. Code § 1710(2), and "[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true," see Civ.Code, § 1572(2).  Small, 30 Cal.4th at 187; Fox v. Pollack, 181 Cal.App.3d 954, 962 (1986).

As discussed above, the complaint alleges sufficient facts from which an inference can be

made that CDC Defendants knew Plaintiff's ovaries had been removed.   The complaint alleges

that Defendant Reeves repeatedly represented to Plaintiff between 2001 to 2005 that she still had

her ovaries and could still reproduce, including on or around May 14, 2001, May 30, 2001, the

Summer of 2001 (including June 20, 2001 and July 22, 2001), September 4, 2001, and October

17, 2001.   The complaint alleges that in 2002 and 2003, including in or around the month of

May, 2003, Defendant Goodwin misrepresented to Plaintiff that there was nothing wrong with

her health.   The complaint alleges that around January of 2005 Defendant Kruse told Plaintiff

that her ovaries appeared normal.   The complaint alleges that CDC Defendants knew these

representations were false and made them with the intent to have Plaintiff believe that her ovaries

had not been removed.   The complaint alleges Plaintiff justifiably relied on CDC Defendants'

material misrepresentations and omissions and agreed to improper treatment.

Plaintiffs' misrepresentation claim based on CDC Defendants' conduct after surgery is

sufficient to state a claim.   Making all inferences in Plaintiff's favor, CDC Defendants

knowingly lied to Plaintiff about her condition, never told Plaintiff that her ovaries had been

removed, downgraded Plaintiff's symptoms, did not tell Plaintiff she was experiencing

menopause, and continued to insist Plaintiff could still have children.   Because the court finds

the current complaint's claims sufficiently allege CDC Defendants knew about Plaintiff's true

medical condition and lied to her, the complaint sufficiently alleges that CDC Defendants knew

their representations were wrong when they made them.

CDC Defendants argue in their motion that the complaint does not provide specific

details about the time of the misrepresentations as required by Rule 9.   When dismissing these

claims from the prior compliant, the court stated:

> To comply with Rule 9, in filing any amended complaint, Plaintiff must allege the
> content of the misrepresentation and the reason why Defendants knew or should
> have known the statements were false.   In addition, Plaintiff should allege, to the
> extent she can, the time and place of the fraudulent statements.   In filing any
> amended complaint, Plaintiff is advised to list as a defendant in these causes of
> action only Defendants whom Plaintiff has a well-founded belief that a cognizable
> or arguable legal theory exists that would support a cause of action against the
> named Defendants.   While Plaintiff may not know the exact time and place, and

1   this information might be ascertained from Plaintiff's medical records, Plaintiff
2   must make some attempt to narrow the time frame during which the false
    statements were made to something other than the time after surgery.   Thus,
3   Plaintiff misrepresentation causes of action based on statements made after
    surgery fail to state a claim because Plaintiff has failed to allege the required state
4   of mind.

5        This court has found that where fraud allegedly occurred over a period of time, Rule

6   9(b)'s requirement that the circumstances of fraud must be stated with particularity is less

7   stringently applied.   United States v. Hempfling, 431 F. Supp. 2d 1069, 1075 (E.D. Cal. 2006).

8   For example, in United States v. Hempfling, the court found that a complaint which "alleges

9   generally that the fraudulent conduct occurred between 2003 and 2005, and sets forth specific

10  dates on which Hempfling conducted-tax related seminars" met the Rule 9(b) standard.  Id. at

11  1076.   However, allegations that "misrepresentations occurred over the course of 'several weeks'

12  does not adequately indicate when and where the alleged fraud took place." Segal Co. v.

13  Amazon, 280 F.Supp.2d 1229, 1231 (W.D.Wash. 2003).   Similarly, while "there is some leeway

14  to be given when the conduct alleged took place over a long period of time, a blanket statement

15  covering five years will not do."  Hargrove & Constanzo v. C.I.R.,  2006 WL 3176142, *6 (E.D.

16  Cal. 2006).

17       The complaint's current allegations provide sufficient details of the time and date of the

18  alleged misrepresentations to meet Rule 9(b)'s standards.  The complaint alleges that Defendant

19  Reeves' misrepresentations occurred around May 14, 2001, May 30, 2001, June 20, 2001, July

20  22, 2001, September 4, 2001, and October 17, 2001.   The complaint alleges Defendant

21  Goodwin's misrepresentation occurred in or around the month of May, 2003.   The complaint

22  alleges Defendant Kruse's misrepresentation occurred in January of 2005.   Given the time frame

23  over which the misrepresentations were made and because there is no showing Plaintiff could

24  obtain the exact dates of her medical examinations with Defendants, the court finds that the

25  complaint sufficiently identifies the circumstances constituting fraud to allow CDC Defendants

26  to prepare an adequate answer from the allegations.  In addition, the complaint alleges that CDC

27

28                                         28

Defendants have access to Plaintiff's medical records.   These records would reflect the exact dates Plaintiff met with CDC Defendants concerning her medical condition after the surgery.   As such, CDC Defendants has the information necessary to respond to the pleadings.

**F. More Definite Statement**

In the event the court denies CDC Defendants' motion to dismiss, CDC Defendants ask the court to require Plaintiff to provide a more definite statement regarding her claims.

"If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." Fed.R.Civ.P. 12(e).   A Rule 12(e) motion is proper only if the complaint is so indefinite that the defendant cannot ascertain the nature of the claim being asserted.  See Federal Sav. and Loan Ins. Corp. v. Musacchio, 695 F.Supp. 1053, 1060 (N.D.Cal.1988); Famolare, Inc. v. Edison Bros. Stores, Inc., 525 F.Supp. 940, 949 (E.D.Cal.1981).   The court must deny the motion if the complaint is specific enough to apprise defendant of the substance of the claim being asserted.   See Bureerong v. Uyawas, 922 F.Supp. 1450, 1461 (C.D.Cal.1996); FRA S.P.A. v. Surg- O-Flex of America, 415 F. Supp. 421, 427 (S.D.N.Y. 1976). The court should also deny the motion if the detail sought by a motion for more definite statement is obtainable through discovery. See Beery v. Hitachi Home Electronics (America), Inc., 157 F.R.D. 477, 480 (C.D.Cal.1993).

For the reasons discussed above, the court finds the complaint's allegations are sufficient to allow CDC Defendants to prepare a response.   Any additional details can be obtained in discovery.   Accordingly, the court will not order Plaintiff to provide a more definite statement.

## II.   DEFENDANT MADERA COMMUNITY HOSPITAL'S MOTION

**A. Intentional Infliction of Emotional Distress**

Defendant Madera contends that Plaintiff's intentional infliction of emotional distress cause of action is subject to dismissal because the complaint's allegations against Madera are too vague.   Plaintiff contends that Madera's actions in forcing her to undergo a medical test

1   without her consent is extreme and outrageous conduct.

2       As discussed above, the elements of a claim of intentional infliction of emotional distress

3   are(1) extreme and outrageous conduct by the defendant, (2) intention to cause or reckless

4   disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4)

5   actual and proximate causation of the emotional distress.   Austin, 367 F.3d at 1172; Christensen,

6   54 Cal.3d at 903-04.   "Conduct is extreme and outrageous when it is of a nature which is

7   especially calculated to cause, and does cause, mental distress."   Wilkerson v. Butler, 229 F.R.D.

8   166, 171 (E.D. Cal. 2005).   King, 65 F.3d at 769.  Plaintiff's theory against Defendant Madera is

9   that in September or October 2005 agents of Madera attempted to "force" Plaintiff to consent to a

10  medical procedure that was not disclosed to her.   Plaintiff contends that forcing a patient to

11  consent to an undisclosed procedure and attempting to interfere with a person's bodily integrity

12  amounts to extreme and outrageous conduct.

13      Had Defendant Madera actually conducted a medical procedure without Plaintiff's

14  knowledge or consent, the court would agree with Plaintiff that the complaint sufficiently alleges

15  Defendant Madera's conduct was extreme and outrageous.   However, the complaint alleges

16  Defendant Madera only "attempted" to "force" Plaintiff to undergo the unknown medical

17  procedure.   Because Plaintiff's intentional infliction of emotional distress claim against

18  Defendant Madera is based on the "attempt to force" her to undergo the procedure, the focus is

19  not on the medical procedure itself but on Defendant Madera's use of "force."   As such,

20  Defendant Madera's actions that constituted their "attempt to force" Plaintiff to undergo the

21  procedure are at issue.   However, the complaint is silent on how exactly Defendant Madera

22  "attempted to force" Plaintiff to undergo the procedure.   Such a vague term as "force" could

23  mean that Defendant Madera only told Plaintiff to drink water and that she had to undergo a

24  medical procedure, but relented when Plaintiff told Defendant Madera no one had explained to

25  her what had happened.   This would not be extreme and outrageous conduct.   On the other end

26  of the spectrum, "force" could mean Defendant Madera physically restrained Plaintiff, made her

27

28                                          30

1   consume large amounts of water as she gagged, and caused Plaintiff pain during the preparation

2   process.  Such allegations would probably be extreme and outrageous.   Because the inquiry on

3   Plaintiff's emotional distress claim against Defendant Madera is based on the meaning to be

4   given to "force", the court finds that the complaint is simply too vague to state a claim.

5   Defendants have not been given sufficient notice as to the basis of Plaintiff's claim.

6       Plaintiff's reliance on Golden v. Dungan, 20 Cal.App.3d 295 (1971), for the proposition

7   that less egregious conduct than that alleged against Defendant Madera has been found to be

8   extreme and outrages, is misplaced.  In Golden v. Dungan, the California Court of Appeal held

9   that it was the manner a civil process server attempted service – at midnight, pounding on the

10  door in a loud and boisterous manner, and without any previous attempts to accomplish service –

11  that was extreme and outrageous.  Golden, 20 Cal.App.3d at 299, 309-10.   In this action,

12  Plaintiff has not put Defendant Madera or the court on notice as to the meaning of "force."

13  Unlike Golden v. Dungan, in which the plaintiff described how the attempted forced service was

14  extreme and outrageous, Plaintiff has failed to allege how the attempted forced medical

15  procedure was extreme and outrageous.  Thus, the court finds that Plaintiff has failed to state a

16  claim against Defendant Madera for intentional infliction of emotional distress.

17  **B.  Leave to Amend**

18      In the event the court dismisses any of the complaint's causes of action, Plaintiff requests

19  permission to amend the complaint to cure any defects.   When dismissing a complaint, the Ninth

20  Circuit has stated that "leave to amend should be granted unless the district court determines that

21  the pleading could not possibly be cured by the allegation of other facts." Bly-Magee v.

22  California, 236 F.3d 1014, 1019 (9th Cir.2001) (internal quotation marks omitted);  Chang v.

23  Chen, 80 F.3d 1293, 1296 (9th Cir.  (9th Cir. 1996).

24      Plaintiff has already had one opportunity to amend the intentional infliction of emotional

25  distress claim as to Defendant Madera.   However, in the previous complaint the problem with

26  this claim concerned confusion over Plaintiff's exact theory as to Defendant Madera along with

27

28                                                31

the absence of allegations indicating Defendant Madera knew what Defendant Ugwu-Oju had really done during surgery.   The prior complaint contained no allegations about Defendant Madera's agents "attempting to force" Plaintiff to consent to an unknown medical procedure. As such, Plaintiff was never advised that simply alleging Defendant Madera "attempted to force" Plaintiff to do something is too vague as to comply with Rule 8's pleadings standards.   As such, Plaintiff was not given notice of her pleading deficiency.  In addition, it is not clear that further amendment would be futile.  Thus, the intentional infliction of emotional distress claim against Defendant Madera will be dismissed with leave to amend.

**ORDER**

Based on the above memorandum opinion, the court ORDERS that:

      1.    CDC Defendants' motion to dismiss and motion for a more definite statement are DENIED;

      2.    Defendant Madera's motion to dismiss the intentional infliction of emotional distress claim against it is GRANTED;

      3.    Defendant Madera is DISMISSED with leave to amend as a Defendant to the intentional infliction of emotional distress claim;

      4.    Plaintiff may file any amended complaint, which may attempt to cure the defects as to Defendant Madera on the intentional infliction of emotional distress claim only, within twenty days of this order's date of service.

IT IS SO ORDERED.

**Dated:     February 8, 2007**         _____**/s/ Anthony W. Ishii**_____
0m8i78                                                      UNITED STATES DISTRICT JUDGE